OPINION OF THE COURT
Barbara Jaffe, J.
Claimant, father of 17 year old Scott S., seeks reimbursement in the amount of $5,000 from defendant health insurer for a *214 $7,500 surgical procedure performed on Scott to remove enlarged breast tissue. Defendant denied coverage, relying on its Comprehensive Benefits Plan (the plan). Testifying for claimant were claimant, his son Scott, and Kathy Gross, M.D., Scott’s pediatrician. Testifying for defendant was Allison Williams. All witnesses were credible. Judgment is granted claimant.
I. Facts Adduced at Trial
Scott suffered from a condition known as bilateral gynecomastia, or enlarged breast tissue. In order to avoid the great embarrassment and suffering he endured when ridiculed by his peers, Scott never swam, went to the beach, or engaged in any activities which exposed his chest to view. Gym days at school were particularly difficult for Scott. Although eventually losing a significant amount of weight and reducing his clothing size by eight measurements, Scott’s gynecomastia was not dispelled. Scott thus continued to avoid situations where his condition would be apparent to others. Moreover, although he was accepted for admission to an out-of-state university, he decided he would not attend, as he did not want to live in a dormitory where he anticipated being subjected to ridicule.
Gross, Scott’s pediatrician, recommended surgery to eliminate Scott’s “deformity” and consequent emotional pain. According to Gross, the procedure was medically necessary, a conclusion echoed by her partner, Hershel Glatt, M.D., who wrote in a letter dated January 13, 2004, that because Scott’s gynecomastia was “inhibiting his psychosocial development,” “breast reduction surgery is medically indicated.”
In a letter dated February 17, 2004, the office of plastic surgeon Dr. Martin E. Kessler requested from defendant presurgical authorization for a bilateral mastectomy for Scott, relying on Kessler’s interview with Scott which reflected that Scott suffered “increased pain and distress.” Accompanying the request for authorization were preoperative photographs of Scott, a letter from Scott dated February 16, 2004 in which he detailed the embarrassment and ridicule he endured as a result of his gynecomastia, and Glatt’s letter.
Williams, a representative of defendant, testified that coverage was not authorized because the surgery was elective, cosmetic, and not medically necessary within the meaning of the plan. She submitted to the court the plan and the correspondence relating to the instant claim.
*215 According to the plan, defendant does not cover services unless they are “medically necessary.” (Plan § 1 [10] [“Criteria for Coverage”].) As relevant here, for health care services to be “medically necessary,” they must be provided for the direct care or treatment of “the condition, illness, disease, injury or ailment” in accordance with accepted community standards of good medical practice, and cannot be omitted under those standards. Additionally, the services must not be in excess of the care indicated by generally accepted standards of good medical practice in the community and must not be furnished primarily for the convenience of the patient, the patient’s family or the provider. (Id.) In determining whether a procedure is medically necessary, the plan provides that “the fact that your doctor prescribed or provided the care does not automatically mean that the care qualifies for payment under this Plan.” (Id.)
The plan specifically excludes services performed in connection with elective cosmetic surgery or treatment which is primarily intended to improve one’s appearance, except, as relevant here, when related to reconstructive surgery performed “because of congenital disease or anomaly of a covered child, which has resulted in a functional defect.” (Plan § 7 [“Principal Limitations and Exclusions”].) The term “functional defect” is nowhere defined in the plan.
In a letter to Kessler dated February 27, 2004, defendant’s medical director, Janet L. Carr, M.D., advised that a GHI clinical peer reviewer had determined that the surgery was not authorized, as “[t]here is no suspicion of malignancy and the physical examination supports the benign nature of the condition.” Rather, it was determined that Scott suffered from a cosmetic condition.
On March 4, 2004, claimant appealed the determination declining coverage to the New York State Department of Insurance. The determination was upheld in a letter dated March 16, 2004, in which Carr wrote that “[w]hile surgery will improve the appearance of the breasts, no definite functional problems secondary to the gynecomastia have been identified and therefore, surgery will not lead to functional improvement.” Moreover, as Carr believed that the primary goal of the procedure was to improve Scott’s appearance, she decided that coverage was not warranted.
By application dated April 19, 2004, claimant commenced an external appeal relating to the final adverse determination. In a letter dated May 24, 2004, the determination denying authori *216 zation was upheld by an unidentified plastic surgeon who reviewed all of the documentation listed above. In an accompanying report, the physician observed that Scott “has depression related to concerns over the size of his breasts.” Nevertheless:
“[w]hile it is certainly reasonable that the patient has emotional distress from his breast size, the role of breast reduction in the treatment of his emotional problems has not been defined by a mental health professional. There is no documentation from a mental health professional in substantiation of the procedure from a psychological standpoint. Due to the absence of any documentation of a functional problem secondary to the gynecomastia, breast reduction is not medically necessary for this patient.”
Apparently, it was the absence of documentation from a mental health professional concerning Scott’s functional problem that formed the basis for this ultimate determination that defendant properly denied coverage. Moreover, according to Williams, as none of the physicians who prescribed the surgery were mental health professionals, their opinions as to Scott’s psychological need for the surgery were insufficient to warrant a finding that the surgery was not elective or cosmetic.
Kessler successfully performed the surgeiy, and was presumably paid in full for it.
II. Conclusions of Law
The rights of the parties are governed by the plan and, absent any constitutional or statutory provisions or administrative regulations, an insurer may limit the amount and conditions of liability. (Wachtel v Metropolitan Life Ins. Co., 141 Misc 2d 665, 668 [Nassau Dist Ct 1988], revd on other grounds 146 Misc 2d 670 [App Term, 9th & 10th Jud Dists 1990].) “Generally, the insured has the burden of showing that the loss or expense is covered by the policy, while the insurer has the burden of showing that the loss or expense comes within an exclusion from coverage.” (Oceanside Med. Healthcare, P.C. v Progressive Ins., 2002 NY Slip Op 50188[U], *15 [Civ Ct, Kings County, May 9, 2002], citing Neuwirth v Blue Cross & Blue Shield of Greater N.Y., 62 NY2d 718, 719 [1984].) Exclusions that are specifically and clearly defined will be enforced. (Caporino v Travelers Ins. Co., 62 NY2d 234 [1984].)
Although defendant denied that the surgery was medically necessary, it failed to address the specific criteria set forth in *217 the plan defining medical necessity. Thus, the court is satisfied that claimant sufficiently established through the testimony of Dr. Gross and the letters of Drs. Glatt and Kessler that the surgery constituted direct treatment of Scott’s condition, that it was performed in accordance with accepted community standards of good medical practice, that it could not have been omitted under those standards, that it was not in excess of the care indicated by generally accepted standards of good medical practice in the community, and that it was not furnished primarily for the convenience of Scott, his family, or the provider. Consequently, I find that the surgery was medically necessary within the meaning of the plan.
The more difficult issue is whether defendant sufficiently established that the mastectomy is excluded from coverage under the plan in that it constituted elective cosmetic surgery primarily intended to improve Scott’s appearance, and that Scott’s emotional problems did not constitute a functional defect.*
Although the mastectomy was primarily intended to improve Scott’s appearance, such an improvement was not an end in itself. Rather, it was a means to the end that Scott be able to function as a normal adolescent. In that regard, that the primary intent was to improve Scott’s appearance does not, in and of itself, warrant the conclusion that the surgery was elective and cosmetic.
Analytically, the determination of whether the surgery was elective and cosmetic depends on the dimensions of any “functional defect” which resulted from Scott’s anomaly. As the term “functional defect” is nowhere defined in the plan, the court defines it as an impairment in Scott’s functioning. Scott’s impairment took the form of a fear of any situation that would lead to the exposure of his chest to others. Due to his fear, Scott avoided many activities associated with normal adolescence. While many adolescents avoid activities due to emotional turmoil resulting from abnormalities existing or imagined, Scott’s gynecomastia was an objective, tangible, and unusual source of turmoil, more akin to a clubfoot or cleft palate than to a large nose, heavy acne, or diminutive breasts on an adolescent female. The latter conditions, while objective and tangible, are relatively common and often lead to elective and cosmetic treatments.
*218 The psychological health of an adolescent plays a significant role in determining the dimensions of the adolescent’s reaction to a perceived anomaly. Thus, there may be instances where the anomaly is minor and the adolescent’s reaction, for psychological reasons, is major and irrational. In such cases, psychological treatment may be indicated instead of surgery. Scott’s anomaly, by contrast, was not minor and his reaction to it was rational, if not entirely appropriate; there was apparently no psychological reason for Scott’s emotional impairment. Indeed, one of defendant’s physicians recognized that it was “certainly reasonable” to believe that Scott suffered from “emotional distress” due to his condition.
That Scott’s fear was not psychologically based, however, does not mean that his function was not impaired, even if he could have lived his life with gynecomastia while avoiding embarrassment and ridicule. Three physicians concluded that Scott’s avoidance of many normal activities constituted an impairment or defect in his functioning as a normal adolescent. It is a conclusion likely to be reached by any mental health professional considering the issue, and defendant has not demonstrated otherwise. Viewed in this light, the opinions of those upholding defendant’s denial of coverage are of little probative value.
For these reasons, I find that defendant has failed to sustain its burden of proving by a preponderance of the evidence that the mastectomy was either elective or cosmetic. Rather, it constituted a treatment that was medically necessary to eliminate Scott’s anomaly and impaired functioning.
III. Conclusion
Accordingly, judgment is awarded claimant in the amount of $5,000, with interest from February 27, 2004.
[Portions of opinion omitted for purposes of publication.]

 As defendant presented no evidence that gynecomastia does not constitute a congenital anomaly, it is deemed conceded.